IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No. 19-28-CFC |
| | : | |
| CHRISTOPHER SANCHEZ, | : | |
| | : | |
| Defendant. | : | |

Jesse S. Wenger, Assistant United States Attorney, Wilmington, Delaware

  *Counsel for United States of America*

Mark S. Greenberg, Blue Bell, Pennsylvania

  *Counsel for Defendant*

## MEMORANDUM OPINION

May 12, 2020
Wilmington, Delaware

> COLM F. CONNOLLY
> UNITED STATES DISTRICT JUDGE

Pending before me is Defendant Christopher Sanchez's Motion to Suppress Physical Evidence (D.I. 20). On January 4, 2019, Wilmington Police officers stopped Sanchez for driving without a valid license. During the stop, officers found a handgun on the floorboard of the car Sanchez was driving. Sanchez was taken into custody and charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). The parties have filed numerous briefs pertaining to this motion, and I held an evidentiary hearing. *See* D.I. 20; D.I. 24; D.I. 34; D.I. 37; D.I. 42; D.I. 45

## I. BACKGROUND

On January 4, 2019, officers from the Wilmington Police Department Drugs, Organized Crime, and Vice Division were on patrol in an unmarked vehicle when they saw Sanchez driving a gray Mitsubishi Outlander north on Lincoln Street. *See* Tr. of Hrg. on Def.'s Mot. to Suppress at 21:25–22:25, Nov. 19, 2019. One of the officers, Corporal MacNamara, recognized Sanchez as the driver of the Mitsubishi. Tr. at 22:24–25. MacNamara and Sanchez had known each other for seven or eight years prior to that night. Tr at 5:13–14; Tr. at 58:14–15. MacNamara had information from a reliable informant that Sanchez was in possession of a handgun and that Sanchez was known to drive a gray Mitsubishi

SUV. Tr. at 21:12–15. MacNamara knew that Sanchez had a prior conviction and could not lawfully possess a firearm. Tr. at 21:6–9. MacNamara had also run Sanchez's name through the Delaware Criminal Justice Information System (DELJIS) database on December 20, 2018 and knew that as of that search Sanchez did not have an active Delaware driver's license. Tr. at 20:1–21:1; D.I. 60-1. MacNamara had run Sanchez's name through DELJIS "approximately 20 times" over the years and had "never known him to have a valid Delaware operator's license." Tr. at 24:24–25.

The officers decided to stop Sanchez for driving without a license, which is a violation of Delaware Code tit. 21, § 2701(a). The officers called for back-up to assist them with the stop and followed Sanchez. Tr. at 25:1–14. When Sanchez turned on the 900 block of North Franklin Street, the officers turned on their emergency equipment and executed a car stop. Tr. at 25:15–22. Initially, Sanchez complied with the stop. Tr. at 25:21–22. But then Sanchez's car started to move again, and Sanchez had to be blocked in by the assisting officers. Tr. at 25:23–26:8.

MacNamara and Sanchez both testified at the evidentiary hearing. They dispute what happened next.

MacNamara testified that he exited his vehicle, approached the driver's side of the stopped SUV, opened the driver's door, and ordered Sanchez out of the

2

SUV. Tr. 26:9–23. MacNamara further testified that as soon as he opened the driver's door he saw a handgun at Sanchez's feet. Tr. at 26:22–27:5.

Sanchez testified that MacNamara did not see the gun as soon as he opened the driver's door. According to Sanchez, MacNamara opened the door, pulled Sanchez out of the car, patted Sanchez down, placed Sanchez in handcuffs, pulled out his flashlight, flashed the light inside the car, and then—and only then—spotted the gun on the floorboard. Tr. at 68:13–70:12. Sanchez does not dispute that he had a handgun in his car, that he put the handgun in his car, or that the gun was on the driver's side floorboard. Tr. at 61:25–63:8.

After MacNamara found the handgun, officers took Sanchez into custody and transported him to the police station. D.I. 24, Ex. A at 5. Following an inventory search of the SUV, the handgun was identified as a semi-automatic Rueger P89 9mm that had been reported stolen from the Cecil County, Maryland, Sheriff's Office. *Id.* It had six rounds in the magazine and one in the chamber. *Id.* That night, MacNamara ran Sanchez's name through DELJIS and confirmed that Sanchez did not have a valid Delaware driver's license. Tr. at 29:8–16; D.I. 60-1.

## II. LEGAL STANDARDS

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

3

> and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.* "The ultimate touchstone of the Fourth Amendment . . . is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (*per curiam*) (quotation marks and citation omitted). To deter the state from violating the Fourth Amendment, evidence collected through an unreasonable search or seizure may be suppressed. *See United States v. Katzin*, 769 F.3d 163, 169 (3d Cir. 2014). Evidence that is not acquired directly through a Fourth Amendment violation but would not have been acquired but for investigators exploiting a Fourth Amendment violation may also be suppressed as "fruit of the poisonous tree." *United States v. DeSumma*, 272 F.3d 176, 179 (3d Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

## III. DISCUSSION

Sanchez advances five arguments for why the handgun should be suppressed.

First, Sanchez argues that the car stop was not to investigate whether he was driving without a license but was actually an excuse for MacNamara to search Sanchez's car. The Supreme Court, however, has made it clear that the "subjective intentions [of the seizing officers] play no role" in ordinary Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996). As long as the seizing

officers have sufficient cause to believe a traffic violation has occurred, the stop is reasonable under the Fourth Amendment and the evidence thereby discovered is admissible. *Id.* at 819.

Second, Sanchez argues that the stop was a *de facto* arrest not supported by probable cause. The stop, however, was not a *de facto* arrest. For Fourth Amendment purposes, a person is seized when, "taking into account all of the circumstances surrounding the encounter, the police conduct would . . . communicate[] to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quotation marks and citations omitted). But not all seizures are the same. On one end of the spectrum is a *Terry* stop, which must be justified by "a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quotation marks and citations omitted). On the other end of the spectrum is an arrest, which must be justified by probable cause. *United States v. Harris*, 482 F.2d 1115, 1117 (3d Cir. 1973).

Traffic stops are "a type of *Terry* stop[] and may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3rd Cir. 2018) (citation omitted). A *Terry* stop can become a *de facto* arrest if officers sufficiently intrude on a person's personal security. *See e.g. United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017) (holding that the

defendant was *de facto* arrested when he was involuntarily transported to a police station and detained in a cell). But officers are permitted to "block[] a suspect's vehicle and approach[] with weapons ready, and even drawn," when executing a traffic stop without turning the stop into a *de facto* arrest. *United States v. Edwards*, 53 F.3d 616, 619 (3d. Cir. 1995). Even "placing a suspect in handcuffs while securing a location or conducting an investigation" does not "automatically transform an otherwise-valid *Terry* stop into a full-blown arrest." *United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) (citations omitted). This is because "when police officers make an investigative stop, they may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Edwards*, 53 F.3d at 619 (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

For example, in *Johnson*, Harrisburg police officers stopped a taxi they believed carried individuals who had been involved in a shooting. 592 F.3d at 445. The officers positioned their vehicles to block the taxi's escape, approached the taxi with their weapons drawn, removed two suspects from the taxi, and handcuffed both suspects. *Id.* 445-46. The Third Circuit found that "nothing about the conduct of the Harrisburg police" rose to the level required to constitute a *de facto* arrest. *Id.* at 448.

Even if I were to credit Sanchez's testimony over MacNamara's, the conduct Sanchez attributed to MacNamara and the Wilmington police officers would not rise to the level of the conduct of the police in *Johnson* much less the level required to constitute a *de facto* arrest. According to Sanchez, the Wilmington police blocked Sanchez's exit and MacNamara removed Sanchez from his car, patted him down, and handcuffed him. Those steps were reasonably necessary to secure the location during a traffic stop involving someone suspected of carrying a firearm. Under Third Circuit precedent, those actions did not transform a valid traffic stop into a *de facto* arrest. *Compare Johnson*, 592 F.3d at 448.

Third, Sanchez argues that the officers did not have a reasonable, articulable suspicion that he was driving without a license. Traffic stops are "reviewed under the investigatory detention framework first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968)." *Delfin-Colina*, 464 F.3d at 396. Under that framework, an officer may conduct a *Terry* stop, when he has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted). Reasonable, articulable suspicion "requires a showing considerably less than preponderance of the evidence" and is a "less demanding standard than probable cause[.]" *Id.* at 123. Only "a minimal level of objective justification is necessary for a *Terry* stop." *Delfin-Colina*, 464 F.3d at 396 (quotation marks and citation omitted).

7

Here, MacNamara had that minimal level of objective justification. He credibly testified that he had looked Sanchez up in DELJIS only a few weeks before the stop and had seen that Sanchez did not have a valid license. DELJIS records subpoenaed by Sanchez confirm this testimony. Moreover, MacNamara had looked Sanchez up repeatedly over the course of the preceding seven or eight years and had never known Sanchez to have an active license. Accordingly, when MacNamara saw Sanchez behind the wheel of a car he could articulate a reasonable suspicion that Sanchez was driving unlawfully. That suspicion justified stopping Sanchez to investigate whether he was driving without a license.

Fourth, Sanchez argues that the gun was not in "plain view" and, therefore, MacNamara performed an illegal search to find the gun. D.I. 34 at 2–5. But this argument is contradicted by Sanchez's own testimony. Sanchez testified that after MacNamara ordered him out of the car, patted him down, and cuffed him,

> They put me now by the back door . . . and MacNamara pulls his flashlight out and flashes in there, sees the gun, bam, take him away.

Tr. at 70:4-10.

As I have already noted, MacNamara had the ability to order Sanchez out of the car, pat him down, and handcuff him, as part of the traffic stop without violating Sanchez's Fourth Amendment rights. And MacNamara's "action in shining his flashlight to illuminate the interior of [Sanchez's] car trenched upon no

8

right secured to the latter by the Fourth Amendment." *Texas v. Brown*, 460 U.S. 730, 740 (1983). Therefore, even if I were to credit Sanchez's testimony over MacNamara's, MacNamara did not violate the Fourth Amendment before he found the gun.

To the extent Sanchez argues that MacNamara violated his Fourth Amendment rights by seizing the gun, he is incorrect. There are three requirements for valid seizures of evidence in plain view: (i) "the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed[;]" (ii) "the incriminating character of the evidence must be immediately apparent[;]" and (iii) "the officer must have a lawful right of access to the object itself." *United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994) (quotation marks and citation omitted). Again, MacNamara did not violate the Fourth Amendment in arriving at the place from which he could view the gun. The incriminating nature of the handgun was immediately apparent (particularly because MacNamara knew Sanchez and knew he was a felon who could not lawfully possess a firearm). And once MacNamara saw the gun he had probable cause to believe that Sanchez had committed a felony—i.e., being a felon in possession of a firearm—and he could lawfully search the car for evidence of that felony pursuant to the automobile exception to the search warrant requirement. *See United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) ("The automobile

exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant if probable cause exists to believe it contains contraband.") (quotation marks and citations omitted). In short, even if I were to accept Sanchez's testimony, this was a lawful, plain-view seizure.

Finally, Sanchez argues that MacNamara and the Wilmington police violated the Fourth Amendment prohibition, as set forth in *Rodriguez v. United States*, 575 U.S. 348 (2015), on prolonging a traffic stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." 575 U.S. 348, 350–51 (quotation marks and citation omitted). Sanchez, however, points to no evidence suggesting that Wilmington police prolonged this traffic stop. Indeed, Sanchez's testimony was that this was a bang-bang stop, search, and arrest. *See* Tr. at 70:8–10 ("MacNamara pulls his flashlight out and flashes in there, sees the gun, bam, take him away."). Insofar as Sanchez's *Rodriguez* argument is his pretext argument in different clothes, the law is clear that an officer's subjective motivations for a stop are immaterial. *See Whren*, 517 U.S. at 813.

## IV. CONCLUSION

For the foregoing reasons, I will deny Sanchez's Motion to Suppress Physical Evidence.

The Court will issue an order consistent with this Memorandum Opinion.